Daniels, J.
— One of the grounds upon which the attachment was issued was, that the defendants had become indebted to the plaintiffs in the sum of $12,000 and upwards upon the sale and delivery to them of goods and merchandise, and they were also charged with having assigned, disposed of and secreted their property with intent to defraud their creditors. The grounds for the attachment were controverted by the affidavits presented on behalf of the defendants. It was stated that the goods had been sold upon a credit of four months, which, at the time when the attachment was issued, had not expired; and to answer that statement affidavits were produced on behalf of the plaintiffs to establish the fact that the debt had been fraudulently contracted, and for that reason the defendants had deprived themselves of their right to insist upon the credit.
If the plaintiffs were right in the answer made to this objection, then the terms of the credit were not binding upon them, but they were at liberty to bring their action for the recovery of the purchase-price of their goods in the same manner as though no agreement for any period of credit had *161 been made (Wigand agt. Sichel, 3 Keyes, 120; Claflin agt. Taussig, 7 Hun, 223 ; Arnold agt. Shapiro, 29 Hun, 478 ; Nelson agt. Hyde, 66 Barb., 59). And as one of the grounds upon which the attachment was issued was that the defendants had become indebted to the plaintiffs for the price or value of the goods, the fact itself could be established in this manner in answer to the affidavit on the part of the defendants, that the term of credit had not expired when the action was commenced. For by section 683 of the Code of Civil Procedure, the application to discharge the attachment when it may be founded upon proof on the part of the defendants, may be opposed by new proof by affidavit on the part of the plaintiffs tending to sustain any ground for the attachment recited in the warrant. The existence of the indebtedness was one of the grounds so recited, and when that fact was assailed by affidavit on behalf of the defendants, the plaintiffs were entitled to meet and avoid it by showing the fact that the debt itself had become due notwithstanding the agreement made for the credit.
To prove that the debt had been fraudulently contracted, an affidavit was produced, made by Squire Wood, who was connected with the mercantile agency of Wood & Co., who stated that two of the defendants had given the agency information of the pecuniary affairs of their firm, for the purpose of having it communicated to their creditors and merchants with whom they were dealing, and the trade generally, and which was communicated to the plaintiffs as a means of enabling them to know the creditors of the defendants’ firm, and as a guide to them in selling goods on credit to that firm. The time when the statement was made is given in the affidavit as the 19th of January, 1883. But that was evidently a mistake, for the affidavit itself contains a statement of what the two defendants related concerning a change made in their business in May, 1883, which could not have been made if the statement to the agency was communicated in the preceding month of January. The other affidavits relating to *162 the time also show that it must have been in the month of June, and not in the month of January, which it was intended should have been stated in the affidavit. By this statement of their financial affairs, which may be assumed to have been made in June, 1883, it is stated that the two defendants represented that their stock on ■ hand amounted to $80,000; that they had outstanding $75,000, cash in bank, $11,000, making a total of $166,000; that their liabilities were $65,000, leaving a surplus amounting to the sum of $101,000, And it was shown by the affidavits of one of the plaintiffs that this statement of the affairs of the defendants was communicated to them, and that they relied upon that in selling and delivering goods to the defendants on credit, for the price of which the action was commenced.
From the statement of their affairs in this manner the court is at liberty to presume, as the fact was set forth in the affidavit, that it was the intention of the defendants that this information should be communicated by the agency to the persons engaged in the trade in which the defendants were dealing. And that it was so communicated -is shown by the affidavit of one of the plaintiffs, without contradiction, in the case. That this statement was made to the agency has been denied on the part of the defendants; but as they are in conflict in their .statements with other affidavits made in the case, and as Wood was a disinterested witness, the probability of the truth of this denial is against the defendants, so much so as to justify the conclusion that Wood, whose agency had made and preserved a record of the information received, is the most reliable witness upon the subject. The agency had no interest either in misunderstanding or misstating the information, and there is no probability under the circumstances that it did either. It is more probable that the defendants intended to place an exaggerated and unwarrantably favorable state of their affairs on the books of the agency for the purpose of creating for themselves a credit with the persons with whom they expected to deal, that they were not entitled from their *163 true financial situations to claim. The statement was made for persons dealing with them to act upon, and who might well be deceived by it to their prejudice if it should turn out not to be the truth.
When a statement of this nature may be untruthfully made, intending thereby to deceive persons intending to consult it and rely in their dealings upon it, the individuals making it may well be held liable to have perpetrated a fraud, and to have contracted debts created in reliance upon the statement by means of fraudulent misrepresentation. This point was considered in Eaton, &c., Company agt. Avery (83 N. Y., 31), where this view is maintained of the effect of information falsely given in the course of mercantile business through an agency of this description.
That this statement was not a truthful report of the financial condition of the defendants was clearly disclosed by the examination made of their books by persons -selected by a committee of their creditors to make it, and the defendants themselves do not claim that they had this surplus at the time when the statement of their affairs was given to the agency. The books contained no such account of losses by the defendants between the time when the statement was made and the nineteenth of November following, when they made a general assignment for the benefit of their creditors, as would exhaust this surplus and leave them indebted in the sum appearing to be owed by them over and above all their assets at that time. By the statement which one of the defendants made in his affidavit, they seem to have been indebted at the time of them assignment, over and above their assets, in a sum exceeding $75,000, which, according to their books of account, they could not by any possibility have incurred if they had $101,000 surplus in June, 1883. The probability, supported by the examination made of their books, is that they not only did not have this surplus of $101,000, but that they were at that time in an insolvent condition, actually owing a larger amount of indebtedness than their assets would pay to their creditors. *164 They are presumed to have been conversant with the state of their financial affairs, as that was recorded in and presented by their books, and accordingly they must have been aware of the fact, when the statement was made to the agency, that it was untruthful in the extreme. And as it was so made to influence persons dealing with them in giving them credit for goods and merchandise sold, it follows that credit obtained in that manner was fraudulent, and not binding or operative upon the creditors. They were accordingly at liberty, without waiting for the expiration of the stipulated period of credit, to commence their action at once, as the plaintiffs did after the assignment had been made by the defendants, for the recovery of the indebtedness created in their favor. And this fact was a legal answer to the assertion of the credit itself by the defendants in support of their application to discharge the attachment.
In support of the position that the defendants had assigned and disposed of their property with intent to defraud their creditors, reliance was placed by the plaintiffs on two facts. These were that they had paid to Max Wolff a fictitious debt of $13,764.91, and that they had together drawn from the firm the sum of $12,061.81, to be appropriated to their own individual uses and benefit, and not to be passed to the assignee under the general assignment. While the books of the defendants contained no authentic account of the alleged indebtedness to Wolff, it was still made to appear that the firm was indebted to him in the amount he had received. There was therefore, although the payments made to Wolff were suspicious, no necessarily fraudulent disposition of the debtor’s property in making that payment. But as to the amount drawn by themselves from the firm’s assets the case was entirely different, for it was shown that this amount consisted of sums drawn by the different members of the defendants’ firm. It is stated to have been admitted by Louis Wolff, in the presence of the other defendants, who made no denial of the admission at a meeting of the creditors, that the differ *165 ent sums aggregating this amount of $12,061.81 had been drawn by the individual members of the firm to pay individual family debts, and to be devoted to the support and maintenance of their respective families during the time that should elapse between their failure and the date of effecting a settlement with their creditors. And if they effected such a settlement at forty cents on the dollar the money drawn out would be at the disposal of the creditors in part payment of the compromise, but if they did not, then the money withdrawn would be devoted to the support of their respective families. The affidavits made by the defendants in substance admitted that these sums of money had been drawn by them from the moneys of the firm previous to the execution and delivery of the assignment, and in case they failed to secure the compromise of their debts in this manner that they designed and intended to appropriate it to the uses and support of their families. They did not, however, concede the amount to be that stated on behalf of the plaintiffs, but averred it to amount in the aggregate to the sum of $7,978.61. This difference was made up to the extent of $3,083.20 by payments which Moses Henlein made to William Beicliman, to whom he was individually indebted upon a loan. It was not denied that the sum alleged to have been received by him had not as a matter of fact been drawn from the assets of the firm, but to the extent of these two payments that he had become indebted to the person to whom they were made, and made the payments to extinguish that indebtedness. It was still a misappropriation of so much of the property of the firm, whose creditors were entitled to be benefited by it, drawn out by one of its members with the concurrence of the others, intending to and actually appropriating it to the payment of his own individual debts, and unauthorized by the condition in which this firm at that time was financially situated. According to the most favorable state of the case made by the defendants they individually took from the firm assets the sum of $7,973.61 to be chiefly used and appropriated in the future *166 for the support of themselves and their families, unless by means of their assignment and the proposal made by them they could secure an adjustment of their debts with their creditors at the rate of forty cents on the dollar. This was an unlawful appropriation of so much at least of the firm’s property, and it cannot be legally excused by the circumstances that they may not have positively intended thereby to defraud their creditors, for the fact necessarily is to this extent that the creditors were defrauded by making this disposition of this sum of money which the law did not permit them to make in the financial condition in which their affairs appear to have been. If by the assignment itself they had directed the assignee to pay the members of this firm the respective amounts drawn by them it would have been clearly fraudulent and void upon its face, .for the law will not permit insolvent debtors to reserve from their estate, when it may be assigned in this manner for the benefit of their creditors, anything more than the property exempt by statute from levy and sale under execution. That they did not give this direction in the assignment, but individually took the moneys themselves, rendered it no less an unlawful disposition of their property. It was taking from their assets this amount of money which the creditors were entitled to the benefit of in the adjustment of their debts, and within the authorities it was a fraudulent disposition of so much of their assets. It was property taken by them to be withheld from their creditors, unless in the single contingency they should be able to secure a compromise at the rate of forty cents on the dollar, and which they did not afterwards succeed in effecting. A point of this description was considered in White agt. Fagan (18 N. Y. Weekly Dig., 358), where it was held that such an abstraction ' of property p/evious to and in contemplation of a general assignment for the benefit of creditors was fraudulent; and the same conclusion results from what was held in Untermeyer agt. Hunter (26 Hun, 147), and Talcott agt. Hess (31 Hun, 282), and Schultz agt. Hoagland (85 N. Y., 464-468, 469).
*167 It has been supposed by the defendants’ counsel that the case of Sherrill, etc., Co. agt. Harwood (39 Hun, 9), afforded some countenance for this conduct of the defendants. But that case differed so materially in its facts as not to be liable to this construction by any of its language. As the case has been presented, the plaintiffs were entitled to an attachment against the property of the defendants for the reason that they had disposed of a portion of it, at least, with the intent to defraud their creditors, and that conclusion is further confirmed by the entire omission of this sum of money from the inventory filed of the debtor’s property.
In the action of Emil Oelberman and others against the same defendants, the attachment depended very much upon the same circumstances, except the affidavit of Henry Fry authenticating a statement made by the defendants to Dun & Co., in March, 1883, by which they represented themselves as owning a surplus over all their liabilities of $105,000, which was reported to the plaintiffs and upon which they acted in selling the goods for the price of which their action was brought, and an attachment issued in it in their favor. And as the order in' the preceding case should be affirmed, so likewise should the order from which the appeal in this action has been taken.
In the case of William El Iselin and others against the same defendants, additional and further grounds in support of the allegation that the defendants had disposed of their property with the intent to defraud their creditors were charged, consisting of the fact that upon the examination of their books there appeared to be a deficiency in their merchandise unaccounted for, amounting to the sum of $37,900.46. This was ascertained by charging them with the amount of goods admitted to have been on hand on the 1st of January, 1883, at the sum of $85,000, purchases after that date amounting to $291,550.53, and deducting therefrom the amount of their sales, which were shown by the books to be $298,937.51, reduced by a profit of seven and one-half per cent, stated to *168 have been its average amount, and adding the fixtures in the store. In that manner this deficiency was made to appear, and it was in no way satisfactorily explained by the defendants.
The accuracy of this statement was denied by Louis WolfE in the affidavit made by him. But upon the basis of the facts on which his denial was made, the balance of stock on hand would appear to be no more than the sum of $42,095.99, which would be $20,000 less than the $62,132.87 stated to have passed into the hands of the assignee. This discrepancy establishes the fact that he was inaccurate in the statement made by him as to the amount of purchases and sales and stock on hand on the 1st of January, 1883. He also added that the statement made by him of the amount of goods on hand was from $75,000 to $85,0^0. But one of the accountants who examined the books and swore to the statement made, related it to have been from $85,000 to $90,000, and that in his estimate he had put it at the lower of these two amounts. He was also supported by the entries in the books kept by the defendants, and it is probable that he was right in the statements made by him that there was an apparent deficiency in the merchandise account amounting to the sum mentioned by him.
It was also stated in the cases that large payments had been made by the defendants to their friends and relatives, of debts whose existence was not authenticated by their books, and in that manner that the large balance of cash indicated by the books to have been $79,456.60, and conceded by the defendant WolfE to have been $71,565.35, was, with the payments made to Max Wolff and the moneys drawn out by the defendants themselves, so far reduced in amount that only $1,461.90 was passed into the hands of the assignee. The payments complained of and admitted to have been made amounted to more than $35,000. But as the debts themselves were reasonably maintained by the statements made on behalf of the defendants, those payments cannot be held to have been fraudulent, although they are decidedly suspicious, as they *169 were made between the 5th and 17th of November, 1883, shortly before the making of this assignment.
These facts, together with those already stated to have been supported in favor of the applications, still further sustain the propriety of the directions given, and of that more especially applicable to this case, that the order from which the appeal has been taken should be affirmed.
The case of Otto Heinz and others against the same defendants differs from the others in the circumstance that they replevied a portion of their goods which had been sold and delivered to the defendants; and for that reason it has been further objected that they deprived themselves of the right to maintain an action upon the contract for the residue of the sales made by them. The action was brought for the price of the goods sold and delivered between the 17th of March and the 16th of November, 1883, while the goods replevied were sold and delivered on the 16th of November, 1883. This was a sale of a separate and distinct parcel of merchandise from all the others ; and as that was but three days before the execution and delivery of the assignment, it was alleged that they had been procured by fraud, and legally authorized the plaintiffs to rescind that sale ; and in that conclusion they were sustained by the facts which have been made to appear in the course of these proceedings. They might, it is true, have also rescinded preceding sales made by them. But the facts were probably not known to them at that time, on which that could have been done. They, therefore, elected merely to rescind the sale of the last lot of goods, and, as they were not connected with the preceding sales, rescinding that sale in no manner required them to disaffirm the other sales which had been previously made. They had the right to disaffirm the last sale when they discovered that the goods had been fraudulently obtained, without affecting their right to maintain an action for the recovery of the debt owing for the goods previously sold and delivered by them - to the defendants. The case is not within the authorities relied upon in *170 behalf of the defendants. They relate to entire and indivisible transactions, and hold the rule to be that the party deceived cannot disaffirm such transactions or sales in part and maintain an action for the residue as goods sold and delivered. There was no such partial rescission in this case, but it was entire as to the goods known to have been fraudlilently obtained, and they consisted of a distinct and separate quantity purchased at a different time from those for the price of which the present action has been brought, and the plaintiffs could well rescind as to this parcel of goods and affirm the other sales and maintain an action for the recovery of the price. This right results from the well established legal rules affecting transactions of this description, and is supported by what was held by the courts in Mattewan Co. agt. Bently (12 Barb., 645); Wheaton agt. Barber (14 Barb., 594); as well as by the principle of the cases of Wright agt. Pierce (4 Hun, 351); Morris agt. Rexford (18 N. Y., 552); and Bank of Beloit agt. Beal (34 N. Y., 473).
In this case, as well as the others, the order from which the appeal has been taken should he affirmed, together with the usual costs and disbursements.
Davis, P. J., and Brady, J., concurred in the result.